**FORD MOTOR COMPANY, Relator**

v.

**The Honorable Bonnie LEGGAT, Judge, Respondent.**

No. 94–0859.

Supreme Court of Texas.

Argued Feb. 9, 1995.

Decided June 22, 1995.

Rehearing Overruled Sept. 14, 1995.

644

John Henry Coates, Doug Lackey, Austin, Donald D. Colburn, Phoenix, AZ, and Craig A. Morgan, Austin, for relator.

Joel M. Fineberg, George (Tex) Quesada, R. Darin Darby, Frank L. Branson, Ted Z.

Robertson, J. Hadley Edgar, and Michael L. Parham, Dallas, for respondent.

ON PETITION FOR WRIT OF MANDAMUS

Justice CORNYN delivered the opinion of the Court, in which all Justices join.

In this mandamus proceeding Ford Motor Company complains of having to produce certain documents and information concerning litigation involving its Bronco II vehicles. Because we conclude that the trial court abused its discretion by ordering the matters produced and that Ford lacks an adequate remedy by appeal, we conditionally grant the writ.

Reynauld White was killed when the Bronco II he was driving flipped and rolled over on Interstate Highway 45. In the underlying products liability suit, his estate and survivors (the Whites) seek discovery of: (1) a 1982 report by Ford's general counsel to Ford's Policy and Strategy Committee; (2) technical data prepared by Ford engineers at the request of Ford's outside counsel for use by a consultant retained by that counsel; and (3) the amounts paid by Ford in every Bronco II roll-over settlement. After hearing argument but without inspecting the documents, the trial court ordered Ford to produce the documents and to answer interrogatories concerning the settlement amounts. Ford argues that the trial court abused its discretion by compelling discovery because the documents and data are protected by the attorney-client privilege and work-product doctrine, and because the settlement amounts are not relevant or reasonably calculated to lead to the discovery of admissible evidence. We address each object of discovery in turn.

## I. The 1982 Report

According to Ford, the 1982 report to the Policy and Strategy Committee contains legal advice from its principal in-house attorney to a committee of Ford's senior officers and members of its board of directors. The report was presented and discussed at a meeting that took place in Dearborn, Michigan. Ford supported its claim of privilege with the affidavit of William Burmeister, a Ford employee who has been Secretary to the Policy and Strategy Committee since 1989, and in that capacity is the custodian of the document in question. In his affidavit Burmeister described, based on personal knowledge, the usual procedures taken by Ford to assure confidentiality at the Committee's meetings, reviewed the report and the minutes of the meeting, and concluded that the report contained legal advice and that the minutes summarized the discussion of that advice. Although Ford believes the affidavit provides sufficient proof of the applicability of the corporate attorney-client privilege under Texas law, it urges the Court to apply Michigan's law of privilege because that is the state with the most significant relationship to the communication at issue.[1]

In response, the Whites object to the form of Burmeister's affidavit, primarily because of a defective jurat and because only unauthenticated photocopies of the affidavit were submitted. They also argue that the substance of the affidavit does not support a prima facie claim of privilege under Texas law; in fact, they argue, the affidavit was so deficient that the trial court was not required to inspect the documents before making its decision.[2]

The Whites' objections to form are unpersuasive. While Burmeister's affidavit contains an acknowledgement, it also states that Burmeister appeared before the notary, was "first duly sworn," and "on his oath" stated what followed. It thus meets Texas' statutory requirements for affidavits: " 'Affidavit' means a statement in writing of a fact or facts signed by the party making it, sworn to before an officer authorized to administer oaths, and officially certified to by the officer

---

1. In its memorandum filed with the trial court, Ford urged that under a proper conflict-of-laws analysis, the law of Michigan would apply.

2. Ford claims the trial court also abused its discretion by refusing to inspect the documents. Although under certain circumstances a trial court's failure to review documents in camera may itself be an abuse of discretion, see *Weisel Enters., Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex. 1986), in the interests of judicial economy we have conducted our own in camera review.

under his seal of office." Tex. Gov't Code § 312.011. Burmeister also swore that the facts he attested to were based on personal knowledge. *See Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex.1994) (affidavit lacking attestation that statements made were unequivocally based on personal knowledge was legally insufficient). Finally, in the absence of a challenge to the authenticity of the affidavit, submission of a copy is not grounds for rejecting it. *See* Tex.R.Civ.Evid. 1003.

■ The heart of the Whites' substantive challenge to the affidavit is that it does not establish that all of the people who attended the meeting and reviewed the report were "representatives" of the client, in other words, members of the control group as required for Texas' corporate attorney-client privilege to attach. *See* Tex.R.Civ.Evid. 503(a)(2) ("A representative of the client is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client."); *National Tank Co. v. Brotherton*, 851 S.W.2d 193, 198 (Tex.1993) (holding that Tex.R.Civ. Evid. 503(a)(2) clearly adopted the control group test). While the Michigan Supreme Court has not spoken definitively on the matter, Michigan appears to follow federal law when determining who is the client for purposes of the corporate attorney-client privilege, in the form of the subject matter test (sometimes called the scope of employment test). *See Fruehauf Trailer Corp. v. Hagelthorn*, 208 Mich.App. 447, 528 N.W.2d 778, 781 (1995); *see also* Mich.R.Evid. 501 ("Privilege is governed by the common law, except as modified by statute or court rule."); *cf. Lindsay v. Lipson*, 367 Mich. 1, 116 N.W.2d 60, 62 (1962) (discussing attorney-client privilege in noncorporate context). The subject matter test covers more types of communica-

tions by more people at different levels within a corporation than does the control group test. *See Upjohn Co. v. United States*, 449 U.S. 383, 392–97, 101 S.Ct. 677, 684–86, 66 L.Ed.2d 584 (1981) (rejecting control group test in case arising out of Western District of Michigan); *National Tank Co.*, 851 S.W.2d at 197–98 (explaining differences between the tests); Saltzburg, *Corporate and Related Attorney–Client Privilege Claims: A Suggested Approach*, 12 Hofstra L.Rev. 279, 288–94, 306 (1984) (explaining differences between the tests and proposing a new test covering all communications made for the purpose of securing legal advice for the corporation and made in confidence to corporate counsel by people with authority to control the subsequent use and distribution of the communications).[3]

■ Ford argues simply that privileges are substantive and therefore the law of the state with the most significant relationship to the particular issue applies; the Whites argue just as simply that privileges, like rules of evidence, are procedural, and therefore the law of the forum applies. The reality is more complicated. *See* Weintraub, Commentary on the Conflict of Laws § 3.2C1, at 53–55 n. 40 (3d ed. 1986) (noting that testimonial privileges used to be considered procedural, but the trend is to regard them as substantive).

We begin with the conflict-of-law principles established by the Restatement (Second) of Conflict of Laws (1988) (the *Restatement*). *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984) (citing the *Restatement* and adopting rule that in choice-of-law cases, the law of the state with the most significant relationship will apply to the particular substantive issue).[4] Conflict-of-law

---

**3.** For further permutations of these tests, see Black, Annotation, *What Corporate Communications Are Entitled to Attorney–Client Privilege—Modern Cases*, 27 A.L.R.5th 76 (1995); Black, Annotation, *Determination of Whether a Communication Is from a Corporate Client for Purposes of the Attorney–Client Privilege—Modern Cases*, 26 A.L.R.5th 628 (1995).

**4.** We have stated that our courts will honor statutory reporting privileges of foreign jurisdictions under Tex.R.Civ.Evid. 502, *Davidson v. Great Nat'l*

*Life Ins. Co.*, 737 S.W.2d 312, 314 (Tex.1987), but have not previously analyzed a privilege question under a conflict-of-laws approach. The Texas Court of Criminal Appeals did use a conflicts approach in *Tompkins v. State*, 774 S.W.2d 195, 215–16 (Tex.Crim.App.1987), *aff'd per curiam*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989), to decide that Virginia law of privilege would the govern psychologist-patient privilege when communications by the defendant were made in Virginia. The Michigan Court of Appeals has used a similar approach to deter-

analysis has changed in large part from the territorial approach of the *Restatement (First) of Conflict of Laws* in 1934 to the "significant relationship" analysis of the second *Restatement.* WEINTRAUB, *supra,* § 1.5 at 7; Reese, *Conflict of Laws and the Restatement Second,* 28 LAW & CONTEMP. PROBS. 679 (1963), *reprinted in* PERSPECTIVES ON CONFLICT OF LAWS: CHOICE OF LAW 42–59 (Martin ed., 1980). In keeping with a more functional approach, although section 138 of the *Restatement* provides that the law of the forum governs the general admissibility of evidence, the section governing privileged communications directs a court to identify the state of most significant relationship with a communication when determining whose law of privilege should apply. Section 139 provides:

> (1) Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.
>
> (2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

As the state where the communication took place, Michigan is the state of most significant relationship. *See* RESTATEMENT (SECOND) § 139 cmt. e. Our analysis therefore proceeds under subsection (2).

The *Restatement* favors admission of the evidence unless "some special reason" not to admit it exists, and identifies four factors to consider when determining admissibility: number and nature of contacts of the forum with the parties or transaction, materiality of the evidence, kind of privilege, and fairness to the parties. *See id.* § 139 cmt. d. It goes

mine that Michigan law should govern the privilege of a polygrapher when the polygraph was conducted in that state even though the crime that was the subject of the polygraph took place

on to explain that "the forum will be more inclined to give effect to a foreign privilege that is well established and recognized in many states," and if the privilege "was probably relied upon by the parties." *Id.* The purpose of the attorney-client privilege and the reliance placed by the client on the confidential nature of the communications create special reasons why Texas should defer to the broader attorney-client privilege of Michigan in this case.

■■ The attorney-client privilege has been recognized as "the oldest of the privileges for confidential communications known to the common law." *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989) (citing *Upjohn Co.,* 449 U.S. at 389, 101 S.Ct. at 682). Among communications privileges, it is the only one recognized by every state, even though its scope, as this case demonstrates, may vary. *See* Sterk, *Testimonial Privileges: An Analysis of Horizontal Choice of Law Problems,* 61 MINN.L.REV. 461, 463 n. 8 (1977). The purpose of the privilege is to ensure the free flow of information between attorney and client, ultimately serving the broader societal interest of effective administration of justice. *Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 160 (Tex.1993); *see also West v. Solito,* 563 S.W.2d 240, 245 (Tex.1978). A client must be able to confide in an attorney secure that the communication will not be disclosed. *Ravary v. Reed,* 163 Mich.App. 447, 415 N.W.2d 240, 243 (1987); *Grubbs v. K Mart Corp.,* 161 Mich.App. 584, 411 N.W.2d 477, 480 (1987). Although we may reach a different result when confronted with other privileges, in view of the nature and purpose of the attorney-client privilege, we hold that it will be governed by the law of the state with the most significant relationship to the communication. *See* Sterk, *supra,* at 491 n. 95 ("In the case of a privilege designed to encourage open communication, C's [the state with the most significant relationship to the communication] great interest in seeing its privilege

in Delaware, and Delaware sought testimony of the polygrapher. *People v. Marcy,* 91 Mich.App. 399, 283 N.W.2d 754, 756–57 (1979).

recognized should always outweigh F's [the forum state] desire to admit the testimony.").

■■■ As the Michigan Court of Appeals has interpreted *Upjohn Co.*, the attorney-client privilege extends to confidential communications between the employees and corporate counsel given within the scope of the employees' duties to enable the corporation to obtain legal advice. *Fruehauf Trailer Corp.*, 528 N.W.2d at 781. In this case, Burmeister explains in his affidavit how the committee conducts its business and what the nature of its business is, based on his personal knowledge as secretary. He avers that the committee "considers major issues affecting Ford and is the advisory committee to Ford's Office of the Chief Executive," and that the members of the committee are "Ford's officers who are members of the Board of Directors and certain other officers of Ford." ¶ 4. Burmeister further avers that:

> All matters presented at meetings of the Policy and Strategy Committee are considered within Ford to be extremely confidential. Attendance at the meetings by persons other than the Committee members themselves, the Committee Secretary, and the Committee's Legal Advisor is strictly limited to those Ford personnel whose presence is required or valuable to assure that the Committee members will be fully informed regarding the matters being presented; and even then, such persons attend only those portions of the meeting during which their presence is required. [A]ccess [to material relating to meetings of the Committee] is strictly limited. Only those within the Company or lawyers and legal assistants retained by Ford who have need to review the documents are allowed access to them.

¶¶ 8, 9. These averments indicate that anyone who was not a member of the committee was providing information to the committee so that it could act on legal advice. The report itself contains discussion and recommendations concerning specific legal strategy. Although one can argue that Burmeis-

ter's affidavit is sufficient to establish corporate privilege even under Texas' control group test, we conclude that Michigan's law of privilege applies, and that under that law, the affidavit is sufficient and the report is privileged.

## II. Technical Data Prepared by Ford Engineers

■■ Ford also claims the attorney-client privilege and the work-product doctrine protect technical data prepared by its in-house engineers. This data was generated and gathered at the request of Ford's in-house counsel and Failure Analysis Associates, a consultant hired by Ford's outside counsel, Snell & Wilmer, in preparation for trial in two then-pending cases and for future Bronco II litigation.[5] In support of this claim, Ford submitted affidavits from both in-house and outside counsel, and from the engineers. The engineers aver that the materials were prepared at the specific direction of Ford's attorneys, and the attorneys affirm that the information was requested to assist them in preparing trial strategy and that the information was at all times to remain confidential.

Without deciding whether these documents may also fall within the work-product doctrine, we hold that they are protected by the attorney-client privilege under *Upjohn Co.* for the same reasons as the 1982 report and meeting minutes. The affiants affirmatively state that the material was gathered and prepared in a specific form for use by Ford's attorneys and was treated as confidential by the attorneys and Ford. Information gathered in this way falls within the confines of the privilege as explicated in *Upjohn Co.* *See* 449 U.S. at 394, 101 S.Ct. at 685; *see also* STRONG, MCCORMICK ON EVIDENCE § 87.1 at 320 (4th ed. 1992) (distilling from *Upjohn Co.* the rule that information will be privileged if: (1) it is communicated for the express purpose of securing legal advice for the corporation, (2) it relates to the specific corporate

---

**5.** Ford claims only the attorney-client privilege and work-product doctrine apply to the data prepared by its engineers, not the "party communi-

nication or investigative privileges." Relator's Reply Brief at 26.

duties of the employee, and (3) it is treated as confidential within the corporation itself).

*III. Settlement Amounts*

The Whites also seek discovery of the amount that Ford has paid to settle every Bronco II claim. Ford objected on the basis of relevancy, urging that the information would not be admissible at trial, and was not reasonably calculated to lead to the discovery of admissible evidence. *See* Tex.R.Civ.P. 166b(2)(a); *Jampole v. Touchy*, 673 S.W.2d 569, 573 (Tex.1984), *disapproved in part on other grounds by Walker v. Packer*, 827 S.W.2d 833, 842 (Tex.1992). The Whites respond that the information is discoverable "if it might reasonably assist a party in evaluating a case, for trial, or facilitating settlement." Brief in Opposition of Real Parties In Interest at 25. They also claim that the amounts paid to settle other Bronco II claims are relevant to determining Ford's net worth and Ford's motives in handling the claims.

Settlement agreements are discoverable, Tex.R.Civ.P. 166b(2)(f)(2), to the extent they are relevant. Tex.R.Civ.P. 166b(2)(a). Settlement agreements themselves, of course, are not admissible at trial to prove liability. Tex.R.Civ.Evid. 408; *City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669, 673 (Tex.1979).

In three cases two courts of appeals have found settlement amounts not relevant to the particular claims raised and therefore not discoverable. The Fourteenth Court of Appeals held that the cash amounts of settlements from take-or-pay litigation were not relevant to allegations of conspiracy, although the parts of the settlements dealing with the amount of gas that certain parties agreed to take were relevant. *Palo Duro Pipeline Co. v. Cochran*, 785 S.W.2d 455, 457 (Tex.App.—Houston [14th District] 1990, orig. proceeding). The court stated, "Admittedly, the cash amounts might be of interest to the parties here as a comparative bargaining tool for their settlement purpose, but such an interest does not, in our opinion, satisfy the relevancy test for discovery." *Id.* In a pair of mandamus cases arising out of one lawsuit, the Eighth Court of Appeals forbade routine discovery of settlement amounts, citing *Palo Duro Pipeline* with approval and pointing out that revelation of confidential settlement amounts might have a chilling effect on parties' willingness to settle at all. *Burlington N., Inc. v. Hyde*, 799 S.W.2d 477, 481 (Tex.App.—El Paso 1990, orig. proceeding); *Nermyr v. Hyde*, 799 S.W.2d 472, 476 (Tex.App.—El Paso 1990, orig. proceeding). In the underlying lawsuit the parties were disputing ownership of working interests in various oil and gas leases. *Burlington N., Inc.*, 799 S.W.2d at 480; *Nermyr*, 799 S.W.2d at 476. The only Texas case to permit discovery of the amount of a settlement concerned post-judgment discovery efforts to uncover assets upon which to execute. *Collier Servs. Corp. v. Salinas*, 812 S.W.2d 372, 376–77 (Tex.App.—Corpus Christi 1991, orig. proceeding).

We disagree with the Whites' contention that knowledge of settlement amounts is relevant to this case. Knowledge of these singular amounts paid in the past reveals nothing about Ford's current net worth. We also fail to see the relevance of Ford's motives. Ford is not under a duty to settle any litigation, and has already offered to make available to the Whites all petitions or complaints against it from accidents involving a Bronco II, from which the Whites should be able to identify any parties, attorneys, or witnesses they might wish to contact. It appears that the Whites' purpose in pursuing discovery of the amounts of settlement is to determine a settlement strategy for their own case. That is not a proper purpose of discovery, and we specifically disapprove of the request for the information under these circumstances. We emphasize that we should not be interpreted to mean that the amount of a settlement could never be relevant, only that the Whites have offered no explanation of how such information is relevant to their claims in this case.

An appeal is not an adequate remedy when the trial court has erroneously ordered the production of privileged documents or confidential information. *Walker v. Packer*, 827 S.W.2d 833, 843 (Tex.1992). Accordingly, we conditionally grant the writ and direct the trial court to vacate its order of

July 29, 1994, to the extent it compels Ford to produce those documents itemized on page two of the order (except for documents numbered 32529M through 37523M) and to the extent the order compels Ford to answer interrogatories 2, 3, and 4 of Plaintiffs' First Set of Interrogatories. Writ will issue only if the trial court fails to do so.