Harold W. OSBORNE and Baylor
University, Relators,

v.

Honorable Joe N. JOHNSON, Judge,
170th District Court, McLennan,
Texas, Respondent.

No. 10–97–231–CV.

Court of Appeals of Texas,
Waco.

Oct. 10, 1997.

Larry O. Brady, Stuart Smith, Naman, Howell, Smith & Lee, P.C., Waco, for Relators.

LaNelle L. McNamara, McNamara & McNamara, Waco, for Real Parties in Interest.

Joe N. Johnson, Waco, for Respondent.

Before DAVIS, C.J., CUMMINGS J., and FRANK G. McDONALD, C.J. (Retired).

## OPINION

DAVIS, Chief Justice.

Relators Harold W. Osborne and Baylor University bring this action seeking a writ of mandamus against Respondent, the Honorable Joe N. Johnson, Judge of the 170th Judicial District Court of McLennan County. This action stems from a discovery request served upon Osborne by real parties in interest John and Naomi Fox. Osborne and Baylor filed written objections to the request asserting among other things that some of the documents sought are protected by the attorney-client privilege. After conducting a hearing and an in camera review of the documents alleged to be privileged, Respondent ordered Osborne and Baylor to produce the documents for discovery. Osborne and Baylor bring this original proceeding seeking mandamus relief from Respondent's order.

## I. FACTUAL BACKGROUND

John Fox was a professor of anthropology at Baylor. Each summer Fox directed a group of Baylor students and other participants at a field school in Guatemala. After the 1996 field school, several students registered complaints against Fox with Baylor officials concerning incidents which occurred at the field school.

Judy Parker was the primary complainant. Parker alleged among other things that Fox engaged in inappropriate behavior and made inappropriate remarks which carried sexual overtones during the field school. The Foxes filed suit against Parker for libel, slander, tortious interference with John Fox's employment contract, and loss of consortium.

A number of Baylor administrators and other Baylor employees conducted an investigation of the allegations made by Parker and the others. The investigators included, among others, Baylor Provost and Vice-President for Academic Affairs Donald Schmeltekopf, Dean of the College of Arts and Sciences Wallace Daniel, Osborne, who serves as the chair of Fox's department, General Counsel Basil Thomson, and Assistant General Counsel Charles Beckenhauer. Each of the investigators participated to varying degrees in the investigation. Apparently not every member of the investigative group was present at each witness interview or during each discussion of the allegations.

The Foxes served Osborne with a subpoena duces tecum requiring him to appear for a deposition and also requiring him to produce among other items:

- All notes, memorandae [sic], and minutes of meetings of committee investigating Dr. John Fox, together with notes and reports by the committee containing recommendations, to include all draft copies of such notes and reports;

- All notes, minutes or documentation of committee meetings relative to the investigation of Dr. John Fox; and

- Copies of all committee reports on file relating to the investigation of Dr. John Fox, to include copies of all letters, notes and minutes of meetings with and from

Baylor personnel in connection with the investigation.

Osborne and Baylor filed written objections to the subpoena asserting among other things that the documents sought are privileged from discovery by the attorney-client privilege.[1] *See* TEX.R. CIV. EVID. 503. Although Baylor itself was not subpoenaed, it objected on the basis that Osborne engaged in these activities as a representative of the university and in consultation with counsel for the university. *Id.* 503(a)(2).

The parties appeared before Respondent for a hearing on the objections. Osborne and Baylor presented the testimony of Beckenhauer, who testified in pertinent part that during the investigation Osborne acted as a representative of Baylor and sought legal advice from Beckenhauer and other Baylor counsel in connection with the investigation. They also tendered an affidavit signed by Osborne together with the documents (under seal) which they seek to shield from discovery. After considering the testimony, the affidavit, the argument of counsel, and the documents themselves, Respondent overruled Osborne's and Baylor's objections and ordered them to produce the documents.

## II. THE STANDARD OF REVIEW

■ In order to establish their entitlement to mandamus relief, Osborne and Baylor must establish that the court committed a clear abuse of discretion and that they have no adequate legal remedy. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992) (orig.proceeding). When a trial court erroneously orders the production of documents protected by the attorney-client privilege, the aggrieved party has no adequate remedy at law. *Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 589 (Tex.App.—Dallas 1994, orig. proceeding); *see also West v. Solito*, 563 S.W.2d 240, 244 (Tex.1978) (orig.proceeding). Thus, the central issue we must determine in this proceeding is whether Respondent clearly

abused his discretion in ordering disclosure of the documents in question.

■ When the court's interpretation of a privilege against discovery is at issue, we review the court's decision as a legal conclusion. *Moye*, 893 S.W.2d at 589; *Keene Corp. v. Caldwell*, 840 S.W.2d 715, 718 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding). We give limited deference to such a conclusion. *Walker*, 827 S.W.2d at 840. "The trial court has no discretion to determine the law or to apply the law to the facts incorrectly. A clear failure by the trial court to analyze or apply the law correctly is an abuse of discretion." *Moye*, 893 S.W.2d at 589 (citations omitted); *accord Caldwell*, 840 S.W.2d at 718.

However, if the evidence presented suggests the privilege may not apply because the communication was not intended to be confidential or because the privilege was waived, a fact issue exists for the trial court to resolve. *Cameron County v. Hinojosa*, 760 S.W.2d 742, 745 (Tex.App.—Corpus Christi 1988, orig. proceeding). If the parties present conflicting evidence on the applicability of the privilege, the trial court's decision "must be deemed conclusive." *Id.*; *Gulf Oil Corp. v. Fuller*, 695 S.W.2d 769, 773 (Tex.App.—El Paso 1985, orig. proceeding); *see also West*, 563 S.W.2d at 245.

## III. THE ATTORNEY–CLIENT PRIVILEGE

Rule 503 of the Rules of Civil Evidence protects from discovery confidential communications between an attorney or the attorney's representative and a client or the client's representative which are "made for the purpose of facilitating the rendition of professional legal services to the client...." TEX.R. CIV. EVID. 503(b). In this case, we must determine whether the documents which Osborne and Baylor claim to be privileged by this rule constitute communications between "representatives" of Baylor and

1. Osborne and Baylor asserted numerous privileges in their written objections filed with the trial court. However, at the hearing on their objections, the parties limited their argument and evidence to the attorney-client privilege and

the work product privilege. The parties agreed at oral argument that the applicability of the attorney-client privilege is the only issue before this Court.

Baylor's counsel and whether the communications were "confidential."

### A. THE CONTROL GROUP TEST

■ By the promulgation of Rule 503(a)(2), Texas adopted the control group test for determining whether an individual qualifies as the representative of a corporation or other entity which has retained counsel. *See National Tank Co. v. Brotherton,* 851 S.W.2d 193, 198 (Tex.1993) (orig.proceeding). This test finds its origin in *City of Philadelphia v. Westinghouse Elec. Corp.* 210 F.Supp. 483 (E.D.Penn.1962). In *Westinghouse,* the court held that a person qualifies as a representative of a corporation for purposes of the attorney-client privilege if the person is "in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney...." *Id.,* 210 F.Supp. at 485 (quoted by *National Tank,* 851 S.W.2d at 197).

Thus, the Court determined in *National Tank* that a person qualifies as a representative of a corporation or other entity for purposes of Rule 503 if the person "is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client." *National Tank,* 851 S.W.2d at 197 (quoting TEX.R. CIV. EVID. 503(a)(2)). However, the Court may have caused some confusion later in its opinion when it stated, "[U]nder Rule 503(a)(2), the qualifying employees must be those actually having authority to hire counsel *and* to act on counsel's advice...." *Id.,* 851 S.W.2d at 199 (emphasis added). This statement appears to conflict with the plain language of the rule which states the test disjunctively.

We believe this isolated sentence was an inadvertent statement by the Court. In the next paragraph, the Court observed that National Tank offered no evidence to prove that a particular manager's position in the corporation "vested [him] with authority to obtain professional legal services, *or* to act on advice rendered pursuant thereto, on behalf of [National Tank]." *Id.,* 851 S.W.2d at 200 (emphasis added). Thus, we conclude that in order to qualify as a representative of an entity under Rule 503, a person must be shown to either have the authority to obtain professional legal services on behalf of the organization *or* to act on advice rendered pursuant to a request made under such authority. Later opinions confirm this conclusion. *See Ford Motor Co. v. Leggat,* 904 S.W.2d 643, 646 (Tex.1995) (orig.proceeding); *El Centro del Barrio, Inc. v. Barlow,* 894 S.W.2d 775, 778 (Tex.App.—San Antonio 1994, orig. proceeding); *accord* 1 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 503.3, at 339 n. 51 (2d ed.1993); *but see Pittsburgh Corning Corp. v. Caldwell,* 861 S.W.2d 423, 425 (Tex.App.—Houston [14th Dist.] 1993, orig. proceeding) (citing control group test conjunctively).

■ An entity can "fairly easily" establish whether an employee qualifies as a representative by affidavit. *See Cigna Corp. v. Spears,* 838 S.W.2d 561, 566 (Tex.App.—San Antonio 1992, orig. proceeding). "Generally, only someone relatively high on the corporate ladder will qualify." GOODE § 503.3, at 335–36. "Communications with underlings who may make internal recommendations to their superiors but who are not themselves authorized to make the final decision will remain unprivileged." *Id.* at 341.

### B. CONFIDENTIALITY

■ The attorney-client privilege only protects confidential communications. TEX.R. CIV. EVID. 503(b).

A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

*Id.* 503(a)(5).

The issue of confidentiality focuses on the intent of the parties at the time the communications are made. GOODE § 503.5, at 347. Communications made in the presence of others who do not qualify as representatives of the client or the lawyer are not considered confidential. *Id.* at 348 n. 13 (citing TEX.R. CIV. EVID. 503(b)); *see also Hinojosa,* 760 S.W.2d. at 746.

## C. The Burden of Proof

An organization seeking protection from discovery of documents which it contends are protected by the attorney-client privilege bears the burden to produce evidence by affidavit or testimony demonstrating the applicability of the privilege. Tex.R. Civ. P. 166b(4); *Giffin v. Smith*, 688 S.W.2d 112, 114 (Tex.1985) (orig.proceeding).

Once a prima facie showing of privilege is made, the party seeking discovery must tender evidence to refute the asserted privilege. *See Moye*, 893 S.W.2d at 591. If the party introduces evidence which counters the claim of privilege, the trial court must conduct an in camera review of the documents to determine whether the asserted privilege applies. *Id.* at 590. Often the documents themselves will be the only evidence which substantiates (or refutes) the claimed privilege. *See Weisel Enter., Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex.1986) (orig.proceeding); *Moye*, 893 S.W.2d at 590.

If in camera review is required, the party in possession of the documents must tender them to the court. *Id.* In doing so, the party must demonstrate the applicability of the privilege to the documents in question. *See Giffin*, 688 S.W.2d at 114. The documents must be segregated from other discoverable items. *See Peeples v. Honorable Fourth Supreme Judicial District*, 701 S.W.2d 635, 637 (Tex.1985) (orig.proceeding). We believe the better practice is that employed by Marathon Oil in *Moye* where the company submitted a detailed log which identified each document and the privileges asserted thereto. *See Moye*, 893 S.W.2d at 591. Each document was separately numbered and identified in the log. *Id.* at 591, 593 nn. 1–2.

"As a reviewing court, we may conduct our own in camera inspection to determine whether a trial court properly applied the law of privilege to the documents." *Id.* at 593 (citing *Barnes v. Whittington*, 751 S.W.2d 493, 495 (Tex.1988) (orig.proceeding)).

## IV. THE EVIDENCE

### A. The Tender of Osborne's Affidavit

As a preliminary matter, the Foxes argue that Osborne and Baylor failed to introduce Osborne's affidavit in evidence, and thus, it may not be considered by this Court. Rule 166b(4) requires that the affidavit be served on opposing counsel at least seven days before the hearing in order to be admitted as evidence.[2] Tex.R. Civ. P. 166b(4). At the beginning of the hearing, counsel informed the court that it would tender Osborne's affidavit with the documents in question for the court's in camera consideration. Counsel stated, "I do not tender either the affidavit or the attached documents in evidence, Your Honor, at least for general use, but I would submit them to the Court for the Court's consideration only and for in camera inspection of the enclosed documents for which we seek protection." At the conclusion of the hearing, counsel tendered the affidavit with the documents stating, "You don't have to take [the affidavit], Judge, but I'm tendering it."

The Foxes did not object to the tender of Osborne's affidavit. In fact, they attempted to tender his deposition testimony in the same manner. Their counsel stated, "I will provide the Judge with an unsigned copy of [Osborne's] deposition for his consideration...."[3] The court stated in its order that it "considered [among other things] the affidavit and deposition testimony of Harold W. Osborne...."

A similar tender has been approved by the Fourteenth Court of Appeals. *GAF Corp. v. Caldwell*, 839 S.W.2d 149, 150–51 (Tex. App.—Houston [14th Dist.] 1992, orig. proceeding). In *GAF*, the party resisting the discovery of certain documents tendered the documents in issue to the court for in camera review with two affidavits attached. *Id.* at 150. The court concluded that the affidavits constituted prima facie evidence that the documents were protected by the attorney-client privilege. *Id.* at 151. Apparently the trial court did not hold a formal hearing on the

---

2. The Foxes stipulated at the hearing that Osborne timely served his affidavit upon them.

3. Counsel then read excerpts from Osborne's deposition into the record.

matter but rather ordered the documents to be delivered for in camera review upon the filing of the objections to the discovery request. *Id.* at 149–50.

Although it is true that the party seeking discovery in *GAF* apparently did not contest the propriety of the manner in which the affidavits were submitted, the court stated unequivocally that the affidavits "presented sufficient evidence to support [the claimed privilege]...." *Id.* at 151; *accord Shell Western E & P, Inc. v. Oliver,* 751 S.W.2d 195, 196 (Tex.App.—Dallas 1988, orig. proceeding) (By attaching affidavits to motion for protective order, "Shell ... produced evidence that the attorney-client privilege that it had asserted applied."). The Dallas court also stated, "An affidavit suffices to produce evidence concerning the applicability of a certain privilege." *Id.*

One decision by our Supreme Court appears to contradict these cases. In *Barnes,* the party objecting to discovery submitted affidavits inside sealed envelopes which also contained the documents the party sought to protect. *Barnes,* 751 S.W.2d at 495. The Court stated, "These affidavits should not have been considered by the trial judge as evidence in support of the privilege because they were never filed with the district clerk; they contain no certificate of service; and, they were not served on opposing counsel." *Id.* The Court observed in a footnote, "Because [the party] failed to properly serve the affidavits, the sworn statements constitute improper *ex parte* communications." *Id.* n. 1. We consider *Barnes* distinguishable because Osborne served the Foxes with a copy of his affidavit in compliance with rule 166b(4).

From these cases we conclude that in a hearing in which a party seeks protection from a discovery order, the party can satisfy the evidentiary requirements of rule 166b(4) by tendering an affidavit to the court without formally offering it in evidence, if the affidavit has been timely served on opposing counsel in accordance with the rule.[4] Thus, we

will consider Osborne's affidavit in deciding the merits of this case.

### B. The Testimony

In addition to the affidavit and the documents in issue, Osborne and Baylor presented the testimony of Assistant General Counsel Beckenhauer. Beckenhauer testified that he participated in the investigation of the complaints against Fox. He explained that three Baylor administrators participated in a supervisory capacity: Schmeltekopf, Daniel, and Osborne, and he described the respective positions of these officials in the chain of command. Fox reported to Osborne; Osborne reported to Daniel; and Daniel reported to Schmeltekopf. According to Beckenhauer, Osborne, Daniel, and Schmeltekopf each had "an inherent authority to deal with the potential disciplinary matter." He explained that each could take some disciplinary action on his own other than termination. Although none possessed the authority to terminate Fox, any of the three could "initiate the dismissal process."

Beckenhauer testified that Osborne, Daniel, and Schmeltekopf each had the authority to seek out legal counsel in the matter involving Fox and to act on the advice of counsel in the matter. He explained that the three of them prepared various drafts of summaries of the investigation; that he guided them in the preparation of the drafts; that he gave them legal advice in connection with the preparation of the drafts; and that in doing so, he was acting as counsel for Baylor and for Baylor's representatives involved in the investigation.

According to Beckenhauer, the investigators had to sift through many facts and make appropriate disciplinary recommendations. Again he advised and counseled Osborne, Daniel, and Schmeltekopf at their request in connection with the compilation of drafts and summaries of findings, proposals and recommendations in connection with the investigation. Beckenhauer testified that the documents tendered under seal include

---

4. Of course the affidavit must set forth competent evidence. "Affidavits filed in accordance with [Rule] 166b(4) must contain something more than a global reiteration of facts ascertain-

able from the face of the documents themselves." *Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex. 1988) (orig.proceeding).

and reflect his advice and counsel and consist of communications between the Baylor General Counsel's office and the investigators and between the investigators themselves.

Beckenhauer concluded by asserting the attorney-client privilege on behalf of Baylor and by testifying that he considers the documents confidential and that the documents were not intended to be disclosed to anyone lacking decision-making authority.

On cross-examination, Beckenhauer explained that he acted as both investigator and counsel in the course of the investigation. He testified that the investigators interviewed students and took written statements from them. General Counsel Thomson and he advised and counseled the investigators on the reliability and trustworthiness of the evidence and in making the "administrative decision" with respect to appropriate sanctions. He did not recall that any of the documents tendered under seal contained any notes explicitly referencing his legal advice, but he does believe that the documents contain "[c]onceptual ideas [attributable to him] in terms of factfinding and discipline and what the appropriate response may or may not be." He believed that a part of his role as counsel in this matter included helping the investigators to evaluate whether their fact findings were reasonable.

Beckenhauer agreed that ultimate decision making authority in the Baylor hierarchy rests with the university's president. After January 1997, Beckenhauer was no longer "intimately involved" with the investigation.

Counsel for the Foxes read selected portions of Osborne's deposition testimony into the record. In the deposition, Osborne testified that the extent of his decision making authority was to confer with Daniel. He identified Baylor Dean for Student Life Martha Lou Scott as another participant in the investigation. He stated that he never received a copy of Parker's written complaint or any other written complaint. Osborne testified that Baylor Senior Counsel Bill Underwood and Becky Singer interviewed him.[5]

## C. The Content of Osborne's Affidavit

Osborne explains in his affidavit that Schmeltekopf, Daniel, and he each have decision-making authority for Baylor "including but not limited to the authority to initiate termination proceedings, to obtain legal counsel, and to act on the advice of legal counsel." He states that the three of them "prepared rough drafts and discussion drafts of summaries of the allegations, . . . of reports of the investigation of such allegations, along with rough drafts of preliminary findings, proposals, and recommendations. . . ." He explains that they prepared these documents with the advice of counsel and forwarded the documents to counsel "for review and comment." Counsel returned the documents to them "with direction, guidance, and legal advice regarding [them]." The documents "include, incorporate, and reflect the guidance, direction, and legal advice" given by counsel. Osborne concludes that the documents "were made for the purpose of facilitating the rendition of legal services to Baylor University, and to us as representatives of Baylor[;] . . . were intended to be confidential and are confidential[;] . . . were not intended to be disclosed to third persons[;] and have not been disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of legal services to the client, or to those reasonably necessary for the transmission of the communications."

## V. THE DOCUMENTS IN QUESTION

The documents in issue came to this court stapled together in an envelope. Various documents within the packet are individually stapled as well. The documents can be generally categorized as: (1) various drafts of a report on the investigation of the allegations against Fox and a proposed cover letter for the report; (2) various drafts of a summary of the allegations; (3) various drafts of proposed sanctions and notations related to appropriate sanctions; (4) office correspondence between Beckenhauer and others concerning an issue tangentially related to the investigation of the allegations; and (5) various handwritten notes apparent-

---

5. The record is silent concerning Becky Singer's position with Baylor.

ly made by Osborne relating to the investigation.

## VI. APPLICATION OF THE LAW TO THE FACTS

### A. OSBORNE'S STATUS

 The Foxes argue that in order for Osborne to qualify as Baylor's representative he must have ultimate decision-making authority. Professor Goode tends to support this position when he states that under *National Tank*, an organization's control group consists of only those "authorized to make the final decision." GOODE § 503.3, at 341. However, we do not read the rule so narrowly.

A person qualifies as a representative of an entity such as Baylor if he has the authority to hire counsel on behalf of Baylor or has the authority to act on advice rendered by counsel pursuant to an authorized request. TEX.R. CIV. EVID. 503(a)(2); *National Tank*, 851 S.W.2d at 197. As the Court stated in *National Tank*, the rule extends not only to those "in a position to control" an entity's decision, but also to those "in a position . . . to take a substantial part in [the] decision. . . ." *National Tank*, 851 S.W.2d at 197.

Beckenhauer's testimony and Osborne's affidavit both assert that Osborne, Daniel, and Schmeltekopf each possessed the authority to obtain legal counsel on behalf of the university and to act on counsel's advice. The evidence presented shows that Osborne at least played a substantial role in the investigation of the allegations and in the recommendation of the appropriate sanctions to be imposed.

The only evidence the Foxes offered to counter this is Osborne's statements that his authority is limited to conferring with Daniel and that he never received a copy of any of the written complaints filed against Fox. This evidence is not sufficient to rebut Osborne's and Baylor's prima facie showing that Osborne was a member of the Baylor control group.

### B. CONFIDENTIALITY

Beckenhauer's testimony and Osborne's affidavit both explained that the investigators prepared the various drafts of their investigative reports and recommended sanctions in consultation with counsel. The testimony and affidavit both assert that the documents tendered under seal incorporate and reflect counsel's advice. The testimony and affidavit also claim that the communications contained in the documents were made for the purpose of facilitation of legal services to Baylor and were intended to be confidential.

From this evidence, Osborne and Baylor made a prima facie showing that the documents tendered under seal are protected by the attorney-client privilege. However, other evidence raised fact questions on the issues of whether the documents were intended to be confidential or whether their confidentiality was waived by subsequent disclosure.

Osborne testified in his deposition that at least one other person was involved in the investigation, the dean of student life. This evidence presented the court with fact questions it had to resolve in order to determine whether the documents in question were kept confidential by Baylor as other Baylor employees were involved in the investigation besides Baylor's counsel and the three "primary" investigators.

Under this state of facts, the documents themselves must be examined to resolve these questions. *See Weisel Enter.*, 718 S.W.2d at 58; *Moye*, 893 S.W.2d at 590.

### (1) The Investigation Report Drafts

These drafts contain a summary of the procedures employed in the investigation; a summary of the allegations; the findings of the investigators; recommended sanctions; and justifications for the proposed sanctions.

The drafts state that interviews of witnesses were conducted "by one or more of the following individuals:" Schmeltekopf, Daniel, Osborne, "Dean for Student Life Martha Lou Scott (the person to whom the allegations concerning the Field School In Guatemala were originally made)," Thomson, Beckenhauer, "Director of Internal Audit Juan Alejandro and Assistant Director of Internal Audit Karen Wash."

■ Neither Osborne nor Baylor offered any evidence that Scott, Alejandro, and Wash are representatives of the university under Rule 503(a)(2). We cannot presume from their respective titles that they are members of Baylor's control group and thus authorized to seek or act on legal advice. *See El Centro,* 894 S.W.2d at 779; *Cigna Corp.,* 838 S.W.2d at 565–66; *see also National Tank,* 851 S.W.2d at 200.

■ Thus, the investigative reports themselves suggest that their contents were disclosed to some extent to other Baylor employees who have not been shown to be within the control group. This constitutes "some evidence either that the communications were never intended to be confidential, or that the privilege was waived by disclosure to third parties...." *Hinojosa,* 760 S.W.2d at 746.

> "If anything in the documents themselves raises a question as to whether the privilege applies, we can no longer presume the documents to be privileged, but the existence of the privilege becomes a question of fact for the trial court, based on the documents and the circumstances under which the communications were made."

*Id.* When the evidence raises a fact question with respect to whether a document was not intended to be confidential or whether the privilege was waived by subsequent disclosure, the trial court's decision is conclusive. *Id.* at 745; *Gulf Oil,* 695 S.W.2d at 773.

Therefore, because a fact issue exists regarding whether the investigative report summaries were intended to be confidential or whether their confidentiality was waived by subsequent disclosure, the trial court's conclusion that these documents are not protected by the attorney client privilege is conclusive. *Hinojosa,* 760 S.W.2d at 746.

### (2) The Summaries of the Allegations

These documents contain recitations of the allegations against Fox and the evidence which the investigators received tending to support or disprove the allegations. According to the summaries:

> "[t]he allegations are listed in order of the perceived strength of the evidence sup-

porting them. Individual allegations within categories are similarly ranked. Judgment of relative strength of evidence is based on the number of persons making the allegation, whether the allegation appears in a sworn statement, and the perceived quality of the testimony of the person or persons making or corroborating the allegation."

Beckenhauer testified that Thomson and he counseled the investigators on the reliability of the evidence presented. He suggested that the investigators' conclusions about the reasonableness of their findings were based at least in part on their counsel.

Assuming for the sake of argument that such counsel falls within the ambit of "professional legal services," however, the allegations are incorporated into the investigative report summaries we have previously addressed. We have already determined that a fact issue exists regarding whether the investigative report summaries were intended to be confidential or whether their confidentiality was waived by subsequent disclosure. Because the allegations are incorporated into the investigative report summaries, a fact issue exists regarding whether the allegation summaries were intended to be confidential or whether their confidentiality was waived by subsequent disclosure. Therefore, the trial court's conclusion that these documents are not protected by the attorney-client privilege is conclusive. *Id.*

### (3) The Proposed Sanctions

The drafts of the proposed sanctions are literally that. They contain various proposed sanctions with commentary.

We have already determined that a fact issue exists regarding whether the investigative report summaries were intended to be confidential or whether their confidentiality was waived by subsequent disclosure. Because the proposed sanctions are incorporated into the investigative report summaries, a fact issue exists regarding whether the proposed sanctions were intended to be confidential or whether their confidentiality was waived by subsequent disclosure. Therefore, the trial court's conclusion that these docu-

ments are not protected by the attorney-client privilege is conclusive. *Id.*

### (4) The Office Correspondence

These documents appear to be inter-office correspondence discussing an immigration matter. In the first memorandum, Beckenhauer presented the options available to Osborne, Daniel, and Schmeltekopf regarding this matter. Four months later, Beckenhauer sent a similar note. Schmeltekopf then replied to Beckenhauer's note.

Beckenhauer sent carbon copies of his original note to three other individuals whose status with Baylor is not shown by the record. Schmeltekopf sent carbon copies of his reply to these three individuals and General Counsel Thomson.

Neither Osborne nor Baylor offered any evidence that the individuals who received copies of this correspondence are representatives of the university under Rule 503(a)(2). We cannot presume that they are representatives of Baylor. *See El Centro,* 894 S.W.2d at 779; *Cigna Corp.,* 838 S.W.2d at 565–66; *see also National Tank,* 851 S.W.2d at 200.

Thus, the correspondence suggests on its face that it was disclosed to some extent to others who have not been shown to be representatives of Baylor. This constitutes "some evidence either that the communications were never intended to be confidential, or that the privilege was waived by disclosure to third parties...." *Hinojosa,* 760 S.W.2d at 746.

Therefore, because a fact issue exists regarding whether the correspondence was intended to be confidential or whether its confidentiality was waived by subsequent disclosure, the trial court's conclusion that these documents are not protected by the

attorney-client privilege is conclusive. *Id.* at 746.

### (5) The Handwritten Notes

The content of the handwritten notes suggest that they were written by Osborne.[6] They include among other things comments on appropriate sanctions to be assessed, comments on the witnesses' statements, and questions raised by the witnesses' statements. The notes are not separately identified in any fashion to suggest who was present when Osborne made them or when he made them. They include comments made by others identified as Ben, John,[7] Bill, and Becky.[8] They also reflect counsel from Senior Counsel Bill Underwood.

 Generally, if a document contains information that is discoverable together with information protected by the attorney-client privilege, the entirety of the document is protected by the privilege. *See Pittsburgh Corning,* 861 S.W.2d at 425; *see also Keene Corp.,* 840 S.W.2d at 719–20.

 However, the handwritten notes do not constitute a single document. They are a series of documents, and the content of these documents show that each was prepared at different times during the investigation. Moreover, Beckenhauer testified that the investigators discussed with Thomson and he the reliability and credibility of the witnesses whom they had interviewed. By submitting the notes together to the court without providing further evidence concerning when they were prepared, who was present or participated in the discussions which led to their preparation, or the status and identity of the persons whose comments are reflected in the notes, a fact issue exists regarding whether the notes were intended to be confidential or whether their confidentiality was

**6.** Indeed, unless Osborne maintained custody of notes made by the others investigating the allegations, it is difficult to conceive how any other notes could be produced by Osborne pursuant to the subpoena. *See* TEX.R. CIV. P. 166b(2)(b) ("A person is not required to produce a document ... unless it is within the person's possession, custody or control.")

**7.** The context of this note does not suggest that the reference is to John Fox.

**8.** At oral argument, counsel for Osborne and Baylor suggested that Becky is an employee of the general counsel's office. However, no evidence in the record substantiates this claim. Osborne identified a person named Becky Singer in his deposition testimony as one of the persons who interviewed him during the investigation.

waived by subsequent disclosure. Thus, the trial court's conclusion that these documents are not protected by the attorney-client privilege is conclusive. *Hinojosa,* 760 S.W.2d at 746.

## VII. CONCLUSION

The evidence presented raises a fact issue concerning whether the documents tendered under seal were intended to be confidential or whether their confidentiality was waived by subsequent disclosure. The trial court's resolution of this fact issue is conclusive. Therefore, we conclude that Respondent did not abuse his discretion in ordering production of the documents. We deny Osborne's and Baylor's petition for mandamus relief.