# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00502-CV

---

**Appellants, Edward Roels, Bruce Barshop, Julie Mak, and Jim Pabst// Cross-Appellants, Lee Valkenaar, Jack Long, Roxann Chargois, Jarred Maxwell and Aqushen, LLC**

**v.**

**Appellees, Lee Valkenaar, Jarred Maxwell, Roxann Chargois, Jack Long, and Aqushen, LLC// Cross-Appellees, Edward Roels, Bruce Barshop, Julie Mak, and Jim Pabst**

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-001505, THE HONORABLE GARY HARGER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

This appeal arises from the trial court's denial of appellants' TCPA motion to dismiss appellees' shareholder-derivative lawsuit. *See* Tex. Civ. Prac. & Rem. Code § 27.003 (outlining TCPA motion procedure);[1] Tex. Bus. Orgs. Code §§ 21.551–.563 (outlining shareholder-derivative proceedings). Appellants (the defendants)[2] are former and current officers and directors of BlueAvocado Co., a private, closely held corporation (the Company) that

---

[1] The TCPA was amended in the 2019 legislative session, but those amendments do not apply to this lawsuit, which was filed before the amendments' effective date. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, §§ 11, 12, 2019 Tex. Gen. Laws 684, 687 (amendments to TCPA apply "only to an action filed on or after" September 1, 2019). Accordingly, this opinion cites to the version of the statute in effect before September 1, 2019.

[2] Appellants and cross-appellees are Edward Roels, Bruce Barshop, Julie Mak, and Jim Pabst. We refer to those parties collectively as "the defendants."

manufactures, distributes, and sells reusable storage bags. Appellees (the shareholders)[3] are current shareholders of the Company who sued the defendants for breach of fiduciary duty. On appeal, the defendants contend that the shareholders failed to establish a prima facie case for their claims and that, in any event, the defendants established one or more valid defenses by a preponderance of the evidence. *See* Tex. Civ. Prac. & Rem. Code § 27.005. On cross-appeal, the shareholders contend that the trial court erred in denying their request for attorney's fees. *See id.* § 27.009(b). For the following reasons, we will reverse the trial court's order denying the motions to dismiss of defendants Mak, Barshop, and Pabst; render judgment dismissing the shareholders' claims against those defendants; and remand for a determination of attorney's fees to which those defendants are entitled. We will also reverse the trial court's order denying Roels's motion to dismiss as to the shareholders' claims against him for his alleged participation in interested-director transactions and render judgment dismissing those claims. We will affirm the remainder of the trial court's order.

## DISCUSSION

*TCPA dismissal procedure*

The TCPA is intended to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" while protecting a person's right to file a meritorious lawsuit for demonstrable injury. *Id.* § 27.002. To that end, the act permits a party to file a motion to dismiss a "legal action" against him if it is based on, relates to, or is in response to his exercise of his right of free speech, right to petition, or right of association. *See id.* § 27.003(a). Courts

---

[3] Appellees and cross-appellants are Lee Valkenaar, Jarred Maxwell, Roxann Chargois, Jack Long, and Aqushen, LLC. We refer to those parties collectively as "the shareholders."

2

review TCPA motions using a three-step analysis. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018). First, the party moving for dismissal must show by a preponderance of the evidence that the TCPA applies to the legal action against it. Tex. Civ. Prac. & Rem. Code § 27.005(b). If the movant meets that burden, the nonmovant must establish by clear and specific evidence a prima facie case for each essential element of its claim. *Id.* § 27.005(c).

"The words 'clear' and 'specific' in the context of this statute have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'" *Hawxhurst v. Austin's Boat Tours*, 550 S.W.3d 220, 230 (Tex. App.—Austin 2018, no pet.) (quoting *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding)). A prima facie case is "the 'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Lipsky*, 460 S.W.3d at 590 (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding) (per curiam)). Collectively, these elements require that the "plaintiff must provide enough detail to show the factual basis for its claim." *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017) (per curiam). If the nonmovant satisfies that requirement, the burden shifts back to the movant to prove each essential element of any valid defenses by a preponderance of the evidence. Tex. Civ. Prac. & Rem. Code § 27.005(d). "In determining whether a legal action should be dismissed under [the TCPA], the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a).

Because the shareholders concede that the TCPA applies to their legal action, we proceed to a consideration of whether they established a prima facie case for each essential element of their breach-of-fiduciary duty claim. We review de novo whether each party met

3

its respective burden.  *See Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, 517 S.W.3d 212, 218 (Tex. App.—Austin 2017, no pet.).

### *The defendants' evidentiary complaints*

Before we consider whether the shareholders established a prima facie case, we address the defendants' complaints about the evidence the shareholders relied on to support their case.  The defendants first contend that three letters the shareholders attached to and incorporated within their petition are hearsay and thus cannot support their prima facie case, citing two cases from the supreme court.  *See Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 378–79 (Tex. 2019) (noting that plaintiff did not present "clear and specific evidence to support falsity element of defamation claim where only evidence supporting element was inadmissible hearsay portions of affidavit containing facts not within affiant's personal knowledge); *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 715–16 (Tex. 2016) (noting that self-serving, conclusory hearsay in plaintiff's affidavit was not "clear and specific evidence" of falsity element of defamation claim).  However, the evidence at issue in *Hall* and *Toledo* was affidavits containing hearsay, not exhibits incorporated by reference into a plaintiff's petition.

"Evidence" for purposes of a TCPA prima facie analysis need not necessarily be admissible, as a prima facie case can be established on the basis of the plaintiff's pleadings alone, with or without supporting affidavits.  *See* Tex. Civ. Prac. & Rem. Code § 27.006(a); *Serafine v. Blunt*, 466 S.W.3d 352, 360 (Tex. App.—Austin 2015, no pet.) (noting that TCPA does not require plaintiff to present testimony or other evidence to satisfy evidentiary burden because pleadings alone may constitute "evidence" in TCPA analysis); *see also Cavin v. Abbott*, 545 S.W.3d 47, 73 (Tex. App.—Austin 2017, no pet.) (deeming as "evidence" for purposes of

4

plaintiffs' TCPA burden "the numerous documents that they attached and incorporated into their petition"). The shareholders incorporated by reference the three letters at issue into their petition, which had the same effect as if the shareholders had set forth the information contained therein in the petition proper. *See* Tex. R. Civ. P. 59 ("Notes, accounts, bonds, mortgages, records, and all other written instruments, constituting, in whole or in part, the claim sued on, or the matter set up in defense, may be made a part of the pleadings by copies thereof . . . being attached or filed and referred to as such . . . and shall be deemed a part thereof for all purposes."); *Cavin*, 545 S.W.3d at 73; *Fawcett v. Grosu*, 498 S.W.3d 650, 660 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (concluding that plaintiff "was permitted to rely on his pleadings (including exhibits) in response to appellant's motion" to dismiss to establish prima facie case). The defendants did not object to the shareholders' attachment of the letters as exhibits to their petition on the basis of Rule 59, and the defendants have identified no requirement that petitions meet the heightened requirements of affidavits to defeat a TCPA challenge. *Cf.* Tex. Gov't Code § 312.011 (defining "affidavit"); Tex. R. Civ. P. 166a(f) (outlining affidavit requirements in context of summary judgments). Because the exhibits constituted a part of the shareholders' pleadings, and because pleadings constitute evidence for purposes of determining whether a party has met its TCPA burden, *see Serafine*, 466 S.W.3d at 360, we conclude that the trial court properly considered the exhibits to the shareholders' petition in determining the merits of the defendants' TCPA motion. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a).

The defendants also contend that the Chargois affidavit is "technically flawed" because in the jurat it identifies the wrong individual who swore to the document: "SWORN to

5

and SUBSCRIBED before me by Michael J. Smith [the shareholders' attorney] this 25 day of June, 2019." However, Chargois's affidavit begins thus:

> BEFORE ME, the undersigned authority, ROXANN CHARGOIS who, being by me duly sworn, deposed as follows:
>
> My name is ROXANN CHARGOIS. I am of sound mind and capable of making this affidavit, and personally acquainted with the facts herein stated.

We hold that this language, combined with the notary's signature and seal, makes this document a competent affidavit, notwithstanding the misnomer in the jurat. *See Malatesta v. Dove Meadows Homeowners Ass'n*, No. 01-08-00772-CV, 2009 WL 5064579, at *3 (Tex. App.—Houston [1st Dist.] Dec. 22, 2009, no pet.) (mem. op.); *see also* Tex. Gov't Code § 312.011 (defining "affidavit" as statement in writing of facts signed by party making it, sworn to before officer authorized to administer oaths, and officially certified by officer under seal of office); *Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 645 (Tex. 1995) (holding that defective jurat, as opposed to absence of jurat, is defect of form and noting that affidavit was proper even without jurat because it contained acknowledgment and recited that affiant was "first duly sworn," and "on his oath" stated facts that followed). Accordingly, the Chargois affidavit also was properly before the trial court in its consideration of the defendants' TCPA motion. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a).

***Whether the shareholders established a prima facie case***

The elements of a claim for breach of fiduciary duty are: (1) the existence of a fiduciary duty between the parties; and (2) a breach of that duty by the defendant that either (3) caused damages to the plaintiff, *Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 429 (Tex. App.—Austin 2009, no pet.), or benefit to the defendant, *Lundy v.*

6

*Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). The defendants do not challenge the shareholders' prima facie case as to the first element or as to their right to bring this derivative action, as it is well-established that corporate directors and officers owe the corporation a fiduciary duty, including "the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation." *Ritchie v. Rupe*, 443 S.W.3d 856, 868 (Tex. 2014); *see* Tex. Bus. Orgs. Code § 21.551 (defining shareholder "derivative proceeding" as civil action brought in right of corporation). Rather, the defendants challenge the second two elements of the shareholders' claims—breach and damages to the Company or benefit to the defendants. We, therefore, will address whether the shareholders have met their prima facie burden as to those two elements.

The shareholders' petition, exhibits, and affidavits comprise nearly one hundred pages—a lengthy accounting of alleged misdeeds by the defendants. However, we will not comb through their evidence to determine whether any particular misdeed sufficiently supports their claims, as it was their burden to link particular facts in the various documents to each essential element of their claims. *See Cavin*, 545 S.W.3d at 72 (noting that it is not enough that plaintiffs merely cite "en masse to pages of the record they deem relevant to *some* unspecified elements" of their claims and "leave[] it to the court to figure out why or how" their burden has been met). Accordingly, we limit our review to the evidence that the shareholders specifically identified and linked to the individual elements of their claims.

The shareholders point to specific evidence in the record to demonstrate the following breaches of the defendants' fiduciary duties: (1) the pursuit and consummation by directors Roels and Barshop of certain improper interested-director transactions; (2)

7

"misappropriation of Company resources" by Roels, former CEO Pabst, and current CEO Mak in connection with the company MBlock's acquisition of a competitor, ADK; and (3) Pabst's "dereliction of duties" by, among other actions, "squander[ing]" a Company opportunity to engage "the designer and innovation partner Rebecca Finell." Because each of the shareholders' various allegations of breach implicate some but not all of the defendants, we will address each in turn to the extent necessary to determine whether the shareholders have established a prima facie case of breach against each defendant.

*Roels's and Barshop's alleged "interested-director transactions"*

The shareholders identify five interested-director transactions as constituting breaches of Roels's and Barshop's fiduciary duties: (1) a July 2016 Series C preferred stock purchase agreement (the Series C Deal), (2) a February 2017 short-term promissory note (the February Note), (3) a March 2017 short-term promissory note (the March Note), (4) a July 2017 promissory note (the July Note), and (5) a September 2017 working-capital note (the September Note).[4]

To support their prima facie case regarding the Series C Deal, the shareholders point to the following relevant facts in their petition and supporting affidavits:

- Roels is the chief financial officer (CFO) of MBlock, a shareholder of the Company.

- Barshop is President of the venture-capital firm Barshop Ventures.

- MBlock controls "virtually all cash flow to and from the Company" by virtue of a May 16, 2016 agreement by which MBlock facilitates all factory orders and payments for such

---

[4] In both their appellate brief and reply in support of their TCPA motion, the defendants identify two short-term loans in 2018 and provide evidence of the Board's approval thereof to support one of their defenses. However, the shareholders specifically complain about four loans in 2017. Therefore, we address only the 2017 loans, for which the defendants did not produce evidence of the Board's approval.

orders, including controlling all of the Company's accounts receivable. "The Board has very little visibility into this arrangement and is regularly advised by . . . Roels and . . . Pabst, without supporting detail, that the Company is in need of cash at the last minute when no other financing options are available on short notice."

- In 2016, shareholder and former Board member George proposed to the Board a Series C stock-purchase deal, but the deal "was not acceptable" to Barshop and Roels, who "had an alternative deal in front of the Board with different terms."

- After "much negotiation," [former Board member Valkenaar] agreed to participate in the merger of the two Series C proposals [George's and Barshop and Roels's]" if Roels and Barshop "would support a performance review of proposed replacement CEO . . . Pabst within an estimate of six months of closing financing, estimated at December 2016. Both [Barshop and Roels] agreed to this term and the Series C advanced, closing in June 2016."

- "The terms of the [Series C] deal provided for an equity investment at an implied valuation of an estimated $7 million and over a 2x liquidation preference, a reduction in value from the previous post-money valuation of over an estimated 30% - 50%, and a significant dilution to all other shareholders and founders."

- In October 2016, Pabst and "virtual CFO" Rich Morales submitted to the Board a short-term debt financing proposal from Roels to meet the Company's short-term capital needs. The proposal had a requirement that Pabst was to keep his position through March 2017, five months longer than had been agreed in the Series C Deal. Roels did not recuse himself from discussion about his proposal and "voted affirmatively on his own proposal." "In the interest of the company, the majority of the Board voted affirmatively to support the debt financing."

The defendants respond that they have established by a preponderance of the evidence one or more valid defenses to the shareholders' claims regarding the Series C Deal, assuming that the shareholders met their prima facie burden (which the defendants do not concede). We agree with the defendants and, therefore, proceed directly to analyze that defense, assuming for purposes of our discussion that the shareholders established a prima facie case to support their claim of breach arising from the Series C Deal. *See* Tex. Civ. Prac. & Rem. Code § 27.005(d).

9

The defendants cite to evidence[5] they presented with their motion to dismiss demonstrating that the Board unanimously consented to and approved of the Series C Deal after all material facts were disclosed. *See* Tex. Bus. Orgs. Code § 21.418(c) (providing that if interested-director transaction has either been approved by Board after material facts are disclosed or is fair to corporation, shareholders will have "no cause of action" against director for breach of duty with respect to transaction); *In re Estate of Poe*, 591 S.W.3d 607, 627–28 (Tex. App.—El Paso 2019, pet. filed) (noting that "common law savings rules" of board consent to interested-director transactions were codified by Business Organizations Code's safe-harbor provisions). The shareholders neither contest this evidence nor allege any specific material facts that Roels and Barshop failed to disclose. Accordingly, we hold that—assuming the shareholders established a prima facie case for Roels's and Barshop's breaches with respect to the Series C Deal—the defendants established by a preponderance of the evidence a valid safe-harbor defense to that claim, and the trial court should have dismissed the shareholders' claims related to the Series C Deal.[6]

Regarding the February, March, July, and September Notes, the shareholders point to the following relevant facts in their petition and supporting affidavits to support their prima facie case:

---

[5] The evidence they reference is an exhibit attached to the affidavit of Barshop entitled "Unanimous Written Consent of [the Company's] Directors" and containing the signatures of all the Company's directors approving the Series C Deal.

[6] Because we conclude that the defendants established the defense of a safe harbor to the shareholders' allegations concerning the Series C Deal, we need not address the defendants' alternate defense asserting that the shareholders have waived their claims about the deal by signing a release of liability in connection therewith.

- In February 2017, Pabst and Roels, on behalf of MBlock, entered into a short-term note (the February Note) pursuant to which MBlock loaned the Company $75,000. The note was negotiated without notice to or comment from the Board. "The repayment terms under the February Note allowed MBlock to demand repayment any time [within two weeks of the note's execution] and deduct payments for the February Note directly from the Company's receivables, a non-market term that disproportionately benefited MBlock."

- In a Board meeting in March 2017, Roels and Barshop "said that [CEO] Pabst did not have time to pursue equity" because he had put the Company in a difficult financial situation by purchasing nearly $600,000 in inventory based on supported forecasted sales rather than booked orders. At the meeting, Roels and Barshop proposed a debt transaction (the March Note) "that had to be completed by the first week of March." The debt deal was "structured as a revolving note, including terms providing MBlock and Barshop all inventory and intellectual property as collateral."

- George, concerned that "the Board was not furnished with adequate information on how to pay [the MBlock and Barshop proposed] debt back," met with other investors, who tendered an alternative deal. The terms of the alternative deal "were more favorable than Roels and Barshop['s] and did not require the inventory and intellectual property as collateral."

- After several Board members resigned, "a new Board was elected and the [Roels and Barshop] debt deal was resurrected, [and] advanced for a vote at a special meeting called by . . . Pabst." Barshop and Roels "remained on the [phone] call [meeting] for the duration of the discussion of their debt deal and did not recuse themselves."

- In July 2017, Pabst and Roels "entered into a note arrangement for $35,000 . . . , the stated purpose of which was to pay Company payroll. . . . Pabst did not seek Board approval for this loan, and did not even advise the Board about the loan until over a month later, when it simply appeared on financial statements." Like the February Note, the July Note "gave MBlock the ability to repay itself directly through the Company's receivables, allowing MBlock to withhold money due to the Company so that MBlock could repay itself, further complicating the Company's cash troubles."

- In September 2017, Roels and board member Pete Heinz executed a $160,000 working-capital line of credit between the Company and MBlock under which the Company "pledged its entire inventory" in the event of a default, which "disproportionally benefits MBlock, to the detriment of the Company and its shareholders." Since execution of the note, MBlock has made additional advances under the note's revolving feature, increasing the Company's indebtedness to $210,000.

- In January 2018, Pabst and Roels, without Board discussion or approval, amended the September Note to "increase the borrowing base to 90% of eligible inventory, increase the interest rate from 7% to 9%, and increase the default rate from 11% to 13%."

11

In sum, the shareholders have alleged clear and specific details about the terms of four loans extended from Barshop and Roels, through their respective related entities, to the Company. Self-dealing (i.e., an "interested transaction") may constitute breach of an officer's or director's fiduciary duty to the corporation. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 85 (Tex. 2015) (holding that summary judgment was improper as to claim for breach of fiduciary duty when there was some evidence showing that challenged renegotiation of mineral lease by fiduciary "was the product of self-dealing," and fiduciary's duties included "acquir[ing] for the non-executive [plaintiff] every benefit that he exacts for himself"); *Poe*, 591 S.W.3d at 634–35 (noting that elements of self-dealing claim—that defendant was interested director who materially benefited from challenged transaction—were undisputed and, thus, burden was on interested director to prove safe-harbor provision of section 21.418 of Business Organizations Code). However, we need not determine whether the shareholders met their prima facie burden as to the element of breach because we conclude that they have not met the burden as to the element of damages.

To prove the damage-to-plaintiff or benefit-to-defendant element of a claim for breach of fiduciary duty based on self-dealing, a plaintiff must demonstrate that the fiduciary obtained a benefit for itself either at the expense of its principal or without equally sharing the benefit with the principal. *See Bradshaw*, 457 S.W.3d at 83 (holding that "essence" of self-dealing is fiduciary's misappropriating for itself what "would have been a shared benefit" with principal); *Mims-Brown v. Brown*, 428 S.W.3d 366, 374–75 (Tex. App.—Dallas 2014, no pet.) ("Self-dealing can be generally defined as an occurrence in which the fiduciary uses the advantage of his position to gain a benefit at the expense of those to whom he owes a fiduciary duty."); *see also Gillespie v. Hernden*, 516 S.W.3d 541, 555 (Tex. App.—San Antonio 2016, pet.

12

denied) (concluding that plaintiff could not support claim of self-dealing by attorney when evidence conclusively proved that benefit to attorney was shared equally with clients).

In the context of TCPA motions to dismiss, while direct evidence of damages is not necessary, the evidence must nonetheless "be sufficient to allow a rational inference that some damages naturally flowed from the defendant's conduct." *See S&S Emergency Training Sols, Inc. v. Elliott*, 564 S.W.3d 843, 847 (Tex. 2018); *see also Deuell v. Texas Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (explaining nonmoving party's burden "to adduce evidence supporting a rational inference as to the existence of damages, not their amount or constituent parts"). While the shareholders have alleged in conclusory fashion that the loans contained "non-market terms" and have "disproportionately benefitted" Roels and Barshop, they have not identified any specific harm to the Company or benefit to the defendants as a direct result of the loans. For instance, they have not cited to any evidence that MBlock and Barshop Ventures have accelerated or otherwise sought to enforce the notes, attempted to seize collateral, or deducted payments from the Company's receivables (although they purportedly had the right to do so). Nor have they alleged that the Company has made any payments on the loans. Without citation to clear and specific evidence permitting the rational inference that damages or improper benefit actually and naturally flowed from the loans, we conclude that the shareholders have not met their prima facie burden with respect to their claims of interested-director transactions against Roels and Barshop and that the trial court should have granted Roels's and Barshop's motions to dismiss as to the alleged interested-director transactions.

*Roels's, Pabst's, and Mak's alleged "misappropriation of Company resources"*

To support their claims against Roels, Pabst, and Mak for "misappropriating Company resources" in connection with MBlock's acquisition of competitor ADK, the shareholders identify the following relevant facts in their petition and supporting affidavits:

- In April of 2017, MBlock entered into a letter of intent to acquire ADK. Without the Board's consent or interest in such acquisition, Roels "included a provision in the letter of intent allowing assignment to the Company." After "assuming the letter," current Company CEO Pabst "proceeded to spend the Company's capital and resources analyzing the transaction and traveling to visit ADK, all at a time when . . . Pabst claimed the Company was out of cash."

- Pabst used "Company resources to fly himself and . . . Mak, the VP of Marketing, to meet with . . . Roels to negotiate with and conduct due diligence on ADK."

- During a period when the Company had little capital, Pabst, Mak, and Roels "flew to Vermont to advance the acquisition of ADK, a reusable bag company." Yet, at "Mak's direction as VP Product and Marketing," the Company had "moved away from the reusable grocery bag business to focus on reusable storage bags where [it] had traction, intellectual property and a clear competitive advantage."

- Pabst, Mak, and Roels "did not present [to the Board] how the Company was going to pay for" the ADK acquisition.

- Roels and Pabst "insisted on briefing the Board on the opportunity [to acquire ADK] numerous times, making it a top priority for the Board instead of briefing the Board on more critical matters, like the Company's inability to make payroll."

- MBlock "reformatted the ADK proposal, agreeing to acquire ADK's assets and license ADK's products to the Company in exchange for 25% of revenue."

- The Board ultimately decided not to proceed with the ADK proposal, including Roel's deciding vote, and then assigned the transaction back to MBlock. MBlock ultimately acquired ADK, likely using the information obtained during the Company's due diligence, and now owns a competitor of the Company.

- The Company "spent thousands of dollars out of pocket and hundreds of hours of Board and management time pursing the ADK acquisition," but MBlock ultimately acquired ADK.

14

In sum, the shareholders alleged that (a) Pabst authorized or spent Company resources to perform due diligence on ADK, possibly knowing all along that MBlock would be the entity that ultimately acquired ADK rather than the Company, and (b) Roels—as an officer of MBlock—entered into the ADK acquisition and pursued due diligence on behalf of the Company with the intention to personally benefit from the Company's expenditure of resources on due diligence. We conclude that Pabst's actions, as alleged, are not sufficient to establish a prima facie case against him for breach because the allegations do not allow for the reasonable inference that his conducting of due diligence was intentionally performed for the benefit of Roels or MBlock rather than the Company. However, we conclude that based on the above evidence it may be reasonably inferred that Roels pursued the acquisition with the intent that he benefit from the Company's expenditure of funds on due diligence, as he initially entered into the letter of intent on behalf of MBlock, brought the unsolicited proposal to the Company and advanced it (including restructuring the deal in MBlock's favor), voted against the proposal on behalf of the Company, and then closed on the deal on behalf of MBlock.

Accordingly, we conclude that the shareholders met their prima facie burden with respect to their "misappropriation of Company resources" claim against Roels but not against Pabst. We also conclude that the shareholders did not establish a prima facie case against Mak, as they merely alleged that she flew on the Company's dime to meetings to discuss the acquisition; they did not allege that she made any decisions authorizing such fund expenditure or personally benefitted from the endeavor knowing it would be to the Company's detriment. Accordingly, the trial court should have granted Mak's and Pabst's motions to dismiss as to the shareholders' "misappropriation of Company resources" claims.

15

*Pabst's alleged "dereliction of duties"*

Below are some of the specific facts that the shareholders identify in their petition

and supporting affidavits to support their claim against Pabst for his "dereliction of duties":

- Pabst decided to purchase nearly $600,000 in inventory in 2016 based on forecasted sales rather than on booked orders, which "put the company in a difficult financial situation." To secure capital, Pabst "advanced numerous financial transactions" with MBlock, including "(1) MBlock 7 day financing and $35 K, (2) Short term note, (3) Demand note and (4) Debt proposal."

- When Roels and Barshop were advancing a March 2017 debt transaction, Pabst ignored George's requests to bring to the Board alternative financing scenarios such as the more favorable alternative deal that George had explored with Jarred Maxwell and Bruce Ballengee. Instead, Pabst evaluated the different options himself, choosing the Roels-Barshop deal. After several Board members resigned and a new Board was elected, Pabst called a special meeting to "advance[] a vote" on the Roels-Barshop deal.

- "Pabst has failed to timely report financials to both the Board and Company shareholders, and important documents, such as lines of credit upon which the Board is expected to vote, have not been shared with the Board in advance of Board meetings, if at all. Reports have often been incorrect or incomplete, and . . . Pabst has made blatantly inaccurate statements to the Board regarding the Company. For example, in a recent statement to the Board . . . Pabst represented that the Company has no retail presence in Canada. A simple internet search reveals multiple Canadian retailers carrying the Company's products."

- In a recent presentation to shareholders, Pabst "omitted listing of one of his largest orders for 2018 . . . worth an estimated $300 - $400k to the Company. At a time when . . . Pabst needed to showcase to the shareholders his abilities to secure international orders, or recruit interest from shareholders in additional investment, he failed to include this material information."

- Pabst has "repeatedly squandered numerous Company opportunities that had the potential to greatly increase revenue and sales," including: (1) failing to sign an agreement with "designer and innovation partner Rebecca Finell after the full Board approved the agreement twice, the Chairman directed him to sign it, and [] Finell had already signed it." The partnership with Finell was "designed to create a new line of heat tolerant (re)zip products with no minimum cash upfront in order to extend the (re)zip patent portfolio, drive immediate enterprise value, and increase the market opportunity." Pabst initially told the Board that Finell walked away from the deal, but he recently admitted that he had walked away because he

16

thought it was a "bad deal."  "With different leadership, . . . Finell may still be interested in a partnership."

- Pabst failed to secure a launch date with QVC to market the Company's products through that platform after the Company had set aside $50,000 of QVC-bundled inventory.  His failures with respect to the QVC deal "compromise[d] any future relationship with QVC along with the accompanying potential increase in sales" and QVC-bundled inventory loss.

- Pabst has failed to meet revenue milestones in a timely fashion, despite being presented with opportunities (as listed above).  Under his leadership, the Company has "frequently found itself in desperate cash situations every 90-120 days that threaten the continued growth of the Company."

- Pabst "appears to be unduly influenced" by MBlock and Roels, "conspiring with them to reject objectively favorable transactions to the Company in favor of financial transactions more beneficial to MBlock."

While we have not recited all of the specific evidence the shareholders reference to support their claims against Pabst for his repeated "failures" as a CEO, the common thread is that Pabst allegedly made numerous inept financial and management decisions for the Company and promoted and executed second-rate deals that favored Roels and Barshop because he was "unduly influenced" by them.  On the basis of this evidence, Pabst's actions might constitute negligence or gross negligence, but such conduct falls within the business judgment rule, which prevents courts from "interfer[ing] with the officers or directors in control of the corporation's affairs based on allegations of mere mismanagement, neglect, or abuse of discretion."  *See Sneed v. Webre*, 465 S.W.3d 169, 178 (Tex. 2015) (citing *Cates v. Sparkman*, 11 S.W. 846, 849 (Tex. 1889), *superseded by statute as stated in Sneed*, 465 S.W.3d at 183); *Chapman v. Arfeen*, No. 09-16-00272-CV, 2018 WL 4139001, at *15 (Tex. App.—Beaumont Aug. 30, 2018, pet. denied) (mem. op.) ("Negligent or grossly negligent conduct falls within the business judgment rule.").

In Texas, the business judgment rule generally protects company officers and directors for alleged breaches of duties that are based on actions that are negligent, unwise,

17

inexpedient, or imprudent if the actions were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved." *Sneed*, 465 S.W.3d at 178. In contrast, "an officer or director's breach of duty that would authorize court interference 'is that which is characterized by ultra vires, fraudulent, and injurious practices, abuse of power, and oppression on the part of the company or its controlling agency clearly subversive of the rights of the minority, or of a shareholder, and which, without such interference, would leave the latter remediless.'" *Id.* at 186 (quoting *Cates*, 11 S.W. at 849); *cf. Chapman*, 2018 WL 4139001, at *15 (noting that fraudulent, dishonest, or self-dealing actions do not fall within business judgment rule); *Cardwell v. Gurley*, No. 05-09-01068-CV, 2018 WL 3454800, at *9 (Tex. App.—Dallas Jul. 18, 2018, pet. denied) (mem. op.) (affirming trial court's failure to apply business judgment rule to protect officers and directors from liability because plaintiff alleged, and evidence supported, defendants' breach of fiduciary duty by engaging in self-dealing and dishonest acts). Essentially, the business judgment rule, as pronounced long ago by the supreme court in *Cates* and reaffirmed more recently in *Sneed*, operates at this stage of a lawsuit as a requirement that a plaintiff plead more than "mere mismanagement," neglect, abuse of discretion, or unwise and inexpedient acts to state a cause of action. *See Sneed*, 465 S.W.3d at 186–87 (noting that "[i]t is insufficient for a shareholder plaintiff to allege a derivative right to relief against a corporation's officers or directors for breach of a duty based upon 'mere mismanagement or neglect . . . , or the abuse of discretion lodged in them in the conduct of the company's business,'" which allegations "may be disposed of on special exceptions or summary judgment") (quoting and citing *Cates*, 11 S.W. at 849)).

Notably, the shareholders did not allege any specific actions or inactions by Pabst that amount to fraud, *cf. Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 217 (Tex. 2011)

18

(listing elements of fraud claim); *Berger v. Flores*, No. 03-12-00415-CV, 2015 WL 3654555, at *7 (Tex. App.—Austin June 12, 2015, no pet.) (mem. op.) (listing elements of fraud-by-nondisclosure claim), and while they alleged in conclusory fashion that he engaged in "fraudulent mismanagement" and recited specific examples of his alleged failures to disclose certain information to the Board, they did not identify any clear and specific evidence of any actual injury the Company has suffered thereby. *See Deuell*, 508 S.W.3d at 689 (noting plaintiff's burden "to adduce evidence supporting a rational inference as to the existence of damages").

Because the shareholders have not identified clear and specific evidence of conduct by Pabst that does not fall within the business judgment rule, we conclude that the trial court should have granted his motion to dismiss as to the shareholders' "dereliction of duties" claims.

### *The cross-appeal*

On cross-appeal, the shareholders contend that the trial court erred in denying their request for attorney's fees because the defendants' motion was "frivolous or solely intended to delay." *See* Tex. Civ. Prac. & Rem. Code § 27.009(b). They support their argument by pointing to a July 16, 2019 letter ruling the trial court issued to the parties, in which the court purportedly "acknowledged" that the defendants' motion was frivolous or solely intended to delay by directing the shareholders' counsel to "prepare an affidavit supporting an award of attorney's fees." However, when the trial court rendered its July 29 order denying the defendants' motion, it specifically found therein that the defendants' motion "was *not* frivolous or solely intended for delay." (Emphasis added.) In the absence of a finding that the defendants'

19

filing of their motion was either frivolous or solely intended to delay, an award of attorney's fees is not authorized by the statute. *Sloat v. Rathburn*, 513 S.W.3d 500, 510 (Tex. App.—Austin 2015, pet. dism'd). Furthermore, to the extent that the shareholders complain that the letter ruling constitutes a determination to award them their attorney's fees, it is an interlocutory order that merged into the final order and is, thus, non-appealable. *See Roccaforte v. Jefferson County*, 341 S.W.3d 919, 924–25 (Tex. 2011); *see also Duffey v. Duffey*, No. 14-16-00144-CV, 2017 WL 6045569, at *3 (Tex. App.—Houston [14th Dist.] Dec. 7, 2017, pet. denied) (mem. op.) (holding that, because there can be only one final order in case, by rendering final order that was inconsistent with prior interlocutory order, trial court necessarily vacated prior order). The shareholders assert no other reason why the trial court's decision to deny them attorney's fees was in error. Accordingly, we overrule the shareholders' cross-point and affirm the trial court's denial of their motion for attorney's fees.

## CONCLUSION

We reverse the trial court's denial of the TCPA motions of Mak, Barshop, and Pabst; render judgment dismissing the shareholders' claims against those defendants; and remand this cause for a determination of attorney's fees to which those defendants are entitled under the TCPA. *See* Tex. Civ. Prac. & Rem. Code § 27.009(a)(1). We reverse the trial court's denial of the TCPA motion of Roels solely as to the shareholders' claims against him for allegedly engaging in interested-director transactions, and we render judgment dismissing those claims. We affirm the remainder of the trial court's order.

20

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed:   August 20, 2020